

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 24, 2019

**BY ECF**

The Honorable Victor Marrero
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Joshua Mirabal*, S3 16 Cr. 272 (VM)

Dear Judge Marrero:

The defendant in this matter, Joshua Mirabal, is scheduled to be sentenced on September 27, 2019. The Government respectfully submits this letter in connection with the defendant's sentencing and in response to the defendant's sentencing submission dated September 18, 2019 ("Def. Submission"). Under separate cover, the Government previously submitted a victim impact statement from the victim's sister and indicated that additional members of the victim's family wish to be heard at sentencing. The Government respectfully submits that a sentence of 300 months' imprisonment, as contemplated by the plea agreement and recommended in the Presentence Report ("PSR"), should be imposed.

## Background

### I.    Offense Conduct

As the Court is aware, this case arises out of a long-term investigation into drug trafficking organizations that conspired to sell narcotics in and around the East Harlem neighborhood of Manhattan, New York. (PSR ¶ 8). As a result of that investigation, the Government learned that between approximately 2001 and 2016—other than periods of incarceration—the defendant agreed with others to sell large quantities of drugs, including cocaine, crack cocaine, heroin, and marijuana. (PSR ¶ 9).

The most egregious conduct in which the defendant participated as part of this conspiracy took place in the summer of 2005. Around that time, the defendant had risen up as a significant dealer of cocaine, among other drugs, in the East Harlem area. (PSR ¶ 10). Meanwhile, a competing drug dealer ("Dealer-1") was growing his own drug business in the same area, thereby threatening the defendant's profits. (*Id.*). Dealer-1 was also involved in conflicts with multiple other drug dealers who operated around the Washington Houses (the "WH DTO"), and

as a result, the defendant found allies who also wanted Dealer-1 out of the picture. (PSR ¶ 11). Together, the defendant and the WH DTO formed a plan to lure Dealer-1 to a particular location in East Harlem and execute him there. (*Id.*). By killing Dealer-1, the defendant hoped not only to cut out his competition in the drug business, but also to improve the defendant's own reputation among other dealers in the neighborhood. (PSR ¶ 10).

On July 30, 2005, the defendant put his plan into motion by calling Dealer-1. During the call, the defendant offered to provide Dealer-1 with a gun to use in an attack against his other rivals. Falling for the ruse, Dealer-1 travelled to the vicinity of 101st Street and First Avenue to meet the defendant. Upon arriving in that area, Dealer-1 waited with a group of friends, including Philip Diaz. The defendant and at least one member of the WH DTO then ambushed Dealer-1 and opened fire. In the hail of bullets that followed, three people were struck: Dealer-1, Diaz, and another bystander. Dealer-1 and the other bystander survived their injuries, but the bullet that entered Philip Diaz's skull killed him. (*See generally* PSR ¶ 11).

The ballistics recovered from the scene of the murder revealed that at least two different caliber guns were fired: a 9 mm and a .380 caliber. The Government does not know which caliber gun the defendant fired that day, and as a result, the Government does not know whether the defendant fired the fatal shot that killed Diaz. Either way, it is nevertheless clear that the defendant planned a murder, lured his victim unsuspectingly to be executed, and then fired a gun multiple times at a group of people intending to kill another human being, all to further his drug business.

## II.    The Defendant's Plea and Guidelines

On March 10, 2017, a superseding indictment was filed in this District charging multiple defendants, including Mirabal. Count Two charged the defendant with participating in a conspiracy to distribute at least 280 grams of crack, five kilograms of cocaine, an unspecified amount of heroin, and 50 kilograms of marijuana, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Count Three charged the defendant with the murder of Philip Diaz through the use of a firearm in furtherance of a narcotics crime, in violation of 18 U.S.C. § 924(j). Also on March 10, 2017, the defendant was arrested. (*See* PSR at 1).

On September 21, 2018, the defendant pled guilty, pursuant to a plea agreement with the Government, to a superseding information containing one count of distributing cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and one count of conspiracy to distribute cocaine, crack cocaine, heroin, and marijuana, in violation of 18 U.S.C. § 371. (*See* PSR ¶¶ 1-5). Under the plea agreement, the defendant agreed to waive the statute of limitations that would otherwise apply and further agreed that his guilty plea would include his admission that he and others shot and killed Philip Diaz on July 30, 2005 in furtherance of the defendant's participation in a narcotics conspiracy. (*See* PSR ¶ 5 n.1).

The PSR and the plea agreement contain the same applicable sentencing range under the United States Sentencing Guidelines ("U.S.S.G."). Pursuant to U.S.S.G. § 3D1.2(b), all counts are treated as a single group ("the Group"). PSR ¶ 16. The Guideline applicable to the Group is U.S.S.G. § 2D1.1. (PSR ¶¶ 17-18). Pursuant to U.S.S.G. § 2D1.1(d)(1), because a victim was

killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial jurisdiction of the United States, U.S.S.G. § 2A1.1 applies to Group One. (PSR ¶ 19). Pursuant to U.S.S.G. § 2A1.1(a), the base offense level is 43. (*Id.*). Because the defendant accepted responsibility through his timely guilty plea, a three-level reduction is warranted. (PSR ¶¶ 26-27). Accordingly, the applicable offense level is 40. (PSR ¶ 28). The PSR concludes, and the Government agrees, that defendant has nine criminal history points, he falls within Criminal History Category IV. (PSR ¶¶ 29-40).

At offense level 40 and Criminal History Category IV, the Guidelines range would be 360 months to life imprisonment. (PSR ¶ 95). Because the plea agreement permitted the defendant to plead to counts of conviction with a total maximum penalty of 300 months, however, the applicable Guidelines range is reduced to the statutory maximum of 300 months' imprisonment. (PSR ¶¶ 94-95). The PSR recommends a Guidelines sentence of 300 months' imprisonment. (PSR at 27-29). In making this recommendation, the PSR emphasizes "the seriousness of the offenses, which resulted in death, Mirabal's past criminal conduct, and his continued blatant disregard of the law." (PSR at 29).

## Discussion

### I.    Applicable Law

Although the Guidelines are not mandatory, they provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in 18 U.S.C. § 3553(a)(2).

### II.    A Guidelines Sentence of 300 Months' Imprisonment Is Appropriate

The Government agrees with the recommendation of the PSR that a sentence of 300 months' imprisonment is warranted here. In particular, the nature and circumstances of the offense, the need to promote respect for the law, the need to reflect the seriousness of the offense, the need to protect the public, the need for deterrence, and the need for just punishment all weigh heavily in favor of a Guidelines sentence.

The defendant's offense conduct is by far the most serious in this case and is among some of the most egregious conduct that comes before this Court. Here, the defendant's participation in this crime involved multiple steps, each of which individually warrants a significant sentence. First, the defendant participated in a premeditated murder plot. He expressly planned to lure Dealer-1 to his death. The defendant's desire to cause the death of his intended target reflects a callous disregard for human life and alone warrants a significant prison sentence. Second, the defendant actively attempted to kill his intended victim by firing a gun at him. Even if the defendant's bullets did not land a deadly blow, his actions demonstrate a willingness to follow

through on his intent to kill another person.  Third, the defendant opened fire on a group of people, thereby endangering multiple bystanders.  In other words, the defendant was so keen to murder his intended target, that he was willing to risk other lives in the process.  Fourth, the defendant's plan and actions resulted in injury to two victims and the death of a bystander.  Regardless of who fired the fatal shot, the defendant bears moral responsibility for the consequences of his plan.  The defendant had every intention of killing his target, and even assuming one of his co-conspirators fired the shots that struck the three victims, such a result occurred only by sheer chance.  Taken together, each of these steps warrants a Guidelines sentence.

Such a sentence will not only reflect the seriousness of the offense but will also ensure just punishment for the harm caused to Philip Diaz's family.  The written statement provided by the victim's sister makes clear that her family still feels the pain of their loss to this day.  That pain is palpable when the victim's sister describes how her brother's death "tore his family apart" and opened a wound that remains raw even fourteen years later.  The shooting that the defendant planned ripped a hole through the Diaz family, leaving two young daughters without a father, a mother without a son, and a sister without a brother.  Such serious conduct merits a correspondingly serious sentence.

Moreover, the defendant's continued criminal conduct after participating in a murder only further demonstrates the need for a Guidelines sentence.  The senseless and unnecessary loss of Philip Diaz's life apparently did nothing to deter the defendant from continuing to commit crimes.  Even after the murder, the defendant continued participating in a drug conspiracy for years.  He also sustained multiple convictions, including two felony convictions for which he received prison sentences.  (*See* PSR ¶¶ 30-37).  Most concerning among these is a shooting the defendant committed in 2009 during which he shot and injured two people.  (PSR ¶ 32).[1]

The defendant's willingness to continue committing violent crimes after already participating in a murder reflects a deeply troubling mindset and highlights the need for a Guidelines sentence to protect the public.  Further, the defendant's violations of parole, probation, and orders of protection suggest that he is not amenable to community supervision.  Even after his transfer to federal custody, the defendant demonstrated continued disregard for authority by incurring a number of disciplinary infractions.  Simply put, no incarceration or supervision or conviction has been sufficient to deter this defendant from committing crimes.  Together with the seriousness of the offense conduct, this background cries out for a Guidelines sentence.

---

[1] Although the defendant claims that this incident was related to a drug robbery, the Government is unaware of any evidence to support that conclusion, and the description of the conduct in the PSR simply says that the defendant shot and injured two people.  Notably, the defendant's plea agreement does not suggest that this conviction was relevant conduct or contemplate any reduction for the sentence he received in that case.  Accordingly, the Government maintains that no reduction below the 25-year Guidelines sentence is warranted here.

In arguing for a sentence of fifteen years' imprisonment, the defense primarily emphasizes the need to avoid unwarranted disparities and the defendant's difficult childhood. The first argument completely ignores the fact that Mirabal is the only defendant in this case being held responsible for a murder. Although Carlos Vega was initially charged in Count Three of the superseding indictment, the Government concluded through further investigation that it could not prove beyond a reasonable doubt that Vega in fact participated in the Diaz murder. As a result, the Court sentenced Vega for his participation in a drug conspiracy and his possession of a firearm during the course of that conspiracy only. That conduct stands in stark contrast with the defendant's participation in a premeditated murder plot that resulted in the death of a bystander and injury to two other people. Because the defendant engaged in far more serious conduct than any of his co-defendants, a far more serious sentence is warranted. Any perceived disparity is certainly justified by the drastically higher harm of taking a life and the much higher danger to society presented by that conduct. Indeed, a 300-month sentence would be consistent with the types of sentences that are regularly imposed in this District for defendants who participate in murders, and such a sentence actually falls several years below the otherwise applicable Guidelines range of thirty years to life imprisonment. Accordingly, a Guidelines sentence would not create unwarranted disparities in this case.

As for the defendant's childhood, the Government does not dispute the defense's description of the trauma the defendant experienced as a result of his father's addiction and the resulting volatility within his family. Such a background is sadly common among defendants in narcotics distribution cases and certainly explains how the defendant entered the drug trade in his early teens. But most defendants do not then escalate to plotting murders and participating in shootings that injure others and kill an innocent bystander. A difficult childhood simply cannot excuse or explain that conduct.

Finally, in evaluating the defense's arguments, it is important to note that the Government has already agreed that the defendant should receive a sentence five years below the otherwise-applicable Guidelines range. When agreeing to that disposition, the Government took into consideration both the defendant's relative culpability and his difficult background. The Government agrees with the PSR that no further leniency beyond that already included in the plea agreement is justified given the egregious nature of the conduct here.

Page 6

**Conclusion**

For the foregoing reasons, the Government respectfully submits that a sentence of 300 months' imprisonment, as contemplated by the plea agreement and recommended in the PSR, would be a just, fair, and appropriate sentence in this case.

Respectfully Submitted,

GEOFFREY S. BERMAN
Acting United States Attorney

By:  _____/s/_____

Maurene Comey
Assistant United States Attorney
(212) 637-2324

cc:    Counsel of Record (by ECF)